IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA, )

Plaintiff, )

VS. ) NO. CR-15-74-JHP

GEORGE WILLIAM RUSSELL, )

Defendant. )

* * *

TRANSCRIPT OF DETENTION HEARING

BEFORE THE HONORABLE KIMBERLY E. WEST

UNITED STATES MAGISTRATE JUDGE

NOVEMBER 16, 2015

* * *

A P P E A R A N C E S:

FOR THE PLAINTIFF: MR. DOUGLAS A. HORN, Assistant U.S. Attorney, 520 Denison Avenue, Muskogee, Oklahoma 74401

FOR THE DEFENDANT: MR. J. LANCE HOPKINS, Attorney at Law, 291 West Keetoowah, Tahlequah, Oklahoma 74464

COURT REPORTER: KARLA S. McWHORTER, CSR-RPR

United States Court Reporter

## I N D E X


PAGE

PLAINTIFF'S CASE-IN-CHIEF

WITNESS CALLED ON BEHALF OF THE PLAINTIFF:

STEVE WEST

Direct Examination by Mr. Horn . . . . . . 3

Cross Examination by Mr. Hopkins . . . . . 28

Government Rests . . . . . . . . . . . . . . . . . . 44

DEFENDANT'S CASE-IN-CHIEF

WITNESS CALLED ON BEHALF OF THE DEFENDANT:

CHERYL ANN MAHORNEY

Direct Examination by Mr. Hopkins . . . . . 44

Cross Examination by Mr. Horn . . . . . . . 50

Defendant Rests . . . . . . . . . . . . . . . . . . . 53

COURT'S RULING . . . . . . . . . . . . . . . . . . . 56

COURT IN SESSION

(2:09 p.m.)

THE COURT: Good afternoon. This is in case CR-15-74-JHP, United States of America versus George William Russell. We are set today for a detention hearing. Mr. Doug Horn appears for the U.S. Attorney office and Mr. Lance Hopkins appears as counsel, having been previously appointed with the defendant.

Gentlemen, are you ready to proceed?

MR. HORN: United States is ready, Your Honor.

MR. HOPKINS: Yes, Your Honor.

THE COURT: Mr. Horn, call your first witness.

MR. HORN: We would call Agent West with the FBI as our first witness.

STEVE WEST, PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. HORN:

Q Sir, would you, please, state your first and last name for us and spell both?

A Steve West, S-T-E-V-E W-E-S-T.

Q Sir, how are you employed?

A Federal Bureau of Investigation.

Q And how long have you been with the FBI?

A Approximately 11 years.

Q And as a part of that training and experience, are

you the case agent in the case involving the United States of America versus George William Russell?

A     Yes, sir.

Q     And does George William Russell also go by the name or the nickname of Willie Russell?

A     Yes, sir.

Q     All right.  And as a part of that investigation, are you aware of the evidence that was presented to the grand jury to secure the one count Indictment that Mr. Russell now faces in this court?

A     Yes.

Q     That involves a May of 2015 drug distribution; is that correct?

A     Yes, sir.

Q     And in that drug distribution could you tell the Court some of the facts associated with that particular charge or case?

A     Yes.  This was a case that was done jointly with the Carter County Sheriff's Department and the Ardmore Police Department.  They had a confidential informant who purchased some from Mr. Russell

Q     And this informant, had this informant had a history of buying drugs from Mr. Willie Russell in the past?

A     Yes.

Q     So do you know how long that Mr. Russell or Mr.

Willie Russell had been selling drugs to this informant in that area of Oklahoma?

A     It was a number of years.

Q     Okay.  So in May of this year there was a drug deal that was arranged; is that correct?

A     Correct.

Q     And did this defendant sell drugs to an undercover officer?

A     Yes.

Q     How much drugs?

A     It was 2.8 grams.  It was going to be an eight ball. It was 2.8 grams.

Q     An eight ball is a drug term; is that correct?

A     Correct.

Q     It stands for one-eighth of an ounce?

A     Yes.

Q     All right.  How much money did the undercover officer pay Willie Russell in order to get this eight ball of drugs?

A     $200.00.

Q     And after Willie Russell was arrested was he read his Miranda?

A     He was.

Q     Did Willie Russell have the ability to do a written statement as to his involvement in that offense to which he is charged?

A Yes.
Q And what did he do?
A He created a written statement that basically said that he met some people at Okie's Corner Store and sold dope for $200.00 and then he clarified meth for $200.00.
Q So he did a written confession of the crime that he is charged with here?
A Yes.
Q Now, Okie's Corner, could you tell the Court a little bit more about Okie's Corner?
A Okie's Corner is located on the southern border of Carter County adjacent to Love County.
Q And which side of the county is Okie's Corner on?
A Okie's corner is on the north side, which is in Carter County.
Q Was there a lot of discussion between Willie Russell and the CI or undercover officer about where this drug deal was going to take place?
A Yes, there was. It took quite a while to set it up. Willie was not wanting to come into Carter County to sell the methamphetamine. So it took a while to set that up.
Q And where did the defendant want the drug deal to take place?
A He wanted to stay in Love County.
Q And why would -- based on your investigation and your

training and experience, why would this defendant want the drug deal to take place in Love County and not in Carter County?
A     Because his father is the sheriff of Love County.
Q     Who is the defendant's father?
A     Sheriff Joe Russell.
Q     Okay.  And he is the elected sheriff of Love County?
A     Yes.
Q     How long has he been the sheriff of Love County?
A     Since approximately 2000, so about 15 years.
Q     All right.  And based on your training and experience then, why would this the defendant want the drug to take place in Love County?
A     There is a history of Willie being protected by the sheriff, protected by his father, not suffering consequences for his drug deals, drug purchases, sales, that type of thing.
Q     All right.  When you are talking and I am saying based on your training and experience, do you have an active investigation ongoing right now?
A     Yes.
Q     And have you interviewed a number of witnesses as a part of that investigation?
A     Yes.
Q     And have a number of those witnesses also gone to

the grand jury?

A Yes.

Q And you are familiar with what their testimony is; is that correct?

A I am.

Q And that involves -- this investigation involves the drug dealing of the defendant Willie Russell and how he is being protected by his father; is that correct?

A That's correct.

Q The sheriff?

A Yes.

Q Now, what other evidence have you gained out of this investigation that the sheriff is protecting the drug dealing activities of Willie Russell?

A Well, there has been drug use for a number of years in Willie's house that he shares with the sheriff, drug purchases, drug sales, drug use, open drug use in the house, and that has been going on with no consequences.

Q All right. So let me go over that again. That is at Sheriff Joe Russell's house; is that correct?

A That's correct.

Q And this defendant lived with Sheriff Joe Russell?

A That is correct.

Q At his house?

A Yes.

Q And during that time -- and again, what time frame are we talking about?
A At least since 2010 probably. It has been a number of years.
Q So since 2010 this defendant has been involved in using drugs and selling drugs?
A Correct.
Q What type of drugs?
A Methamphetamine.
Q And you have developed evidence and done investigative work that this dealing was going on out of or happening at Joe Russell's house?
A Correct.
Q The sheriff's house?
A Yes.
Q While he was active sheriff?
A Yes.
Q Now, what other evidence do you have or have you developed that the sheriff was allowing this defendant to do drug dealing in the Love County area and protecting it?
A Well, there are numerous people that have reported accompanying Willie in the sheriff's Love County Sheriff's office truck selling methamphetamine out of the truck, using methamphetamine in the truck with no consequences.
Q Okay. Let's be clear. When you say the sheriff's

truck, is that a personal truck or a county vehicle?
A I believe it is a personal truck that has the lights and sirens and -- I am not sure who has outfitted that, if the county paid for that or if that was done with personal money.
Q Love County is a small county; is that right?
A Yes.
Q So this truck owned by Sheriff Joe Russell has lights. Do you mean lights on the top that could --
A I think they are the subdued lights in the grill, front grill.
Q Sirens where you can turn a siren on and stop somebody?
A Sirens, radios.
Q Can you hear the police transmissions in that vehicle?
A That's correct.
Q A P.A. system so you could talk loud through that and give commands?
A Correct.
Q And you have developed evidence that this defendant was able to use that sheriff's truck in order to do some of his drug dealing?
A Yes.
Q Now, has the investigation also shown that Sheriff

Russell protected this defendant, his son, by also allowing his son to threaten the execution of certain arrest warrants?
A Yes.
Q Tell the Court about that.
A There is an ex-wife of Willie's who has on numerous occasions been physically assaulted by Willie Russell and at least on a couple of occasions that has been -- that has been covered up.
Q That ex-wife, what is her name?
A Lindsey Price.
Q And you've interviewed her as a part of this investigation?
A That's correct.
Q Lindsey Price appeared before the grand jury?
A That's correct.
Q And would be a key witness in any trial against this defendant; is that correct?
A That's correct.
Q Did Lindsey Price give information about the drug usage and the drug dealing of this defendant?
A Yes. She indicated that it was going on openly during the time that she was married to him.
Q And during that time she lived with this defendant at Sheriff Joe Russell's house?

A I think they lived there for a short time and then they moved into a trailer that was close by.
Q Now, as a part of your interview with Lindsey Price, did she testify about being beaten by this defendant?
A She did, on numerous occasions.
Q And did she describe, if you would, the severity of the beating that this defendant would give her when she was involved with him?
A Yes. I believe she clarified beating to not just being slapped around a little bit -- and she said at least on 20 occasions -- and she is approximating, but on at least 20 occasions he would punch her in the face, kick her, slam her up against walls and beat her rather than just slap her.
Q And was there at least one occasion or more occasions where Lindsey Price was beaten of a significant degree by this defendant that she had to go to the hospital for medical care?
A There was one occasion where Willie and Lindsey Price were riding in the sheriff's truck and something happened and Willie began to punch her, just repeatedly punching her in the face to the point that she -- I forget whether she said she actually lost consciousness or not, but she developed a large cut over one of her eyes.
Q And after she had been beaten by this defendant in

the sheriff's truck, did she get immediate medical attention?
A No, she didn't.
Q How long did it take for her to get medical attention?
A I am not sure. It was quite a while. He called -- I think when she kept asking for medical attention -- I think she was telling him you need to take me to the doctor, I am hurt bad. He then called his sister --
Q You say he called --
A Willie, Willie called his sister.
Q Okay.
A And had her come look at Lindsey and apparently she agreed that Lindsey was hurt bad enough that she needed to seek medical care.
Q Who is this defendant sister?
A Sheritha Bone.
Q And could you spell the last name, please?
A B-O-N-E.
Q And then did Sheritha Bone go with Lindsey Price to the hospital?
A Yes. My understanding is that Sheritha transported Lindsey Price to the emergency room.
Q Could you spell Sheritha?
A I believe it is S-H-E-R-I-T-H-A.

Q Now, what was -- according to Lindsey Price, why was she escorted to the hospital by Sheritha Bone?
A Well, Willie and Sheritha didn't want Willie to go take her to the emergency room for fear that there might be some repercussions. So Sheritha took Lindsey to get medical care and Lindsey felt like the reason that Sheritha took her was to keep an eye on her and make sure she didn't report that Willie had beat her.
Q Did Lindsey Price provide information that Sheritha Bone, the defendant's sister, was checking in with her father, Joe Russell, as to what she was saying to law enforcement, what Lindsey Price was saying?
A I am not sure about that. I don't know if she was checking in with Willie's father or with Willie.
Q She was checking in with somebody?
A Yes.
Q And giving updates or status as to what Lindsey Price was reporting to the hospital?
A That's correct.
Q Did Lindsey Price ever admit that this defendant did that beating at that time?
A No, she did not. I believe she said that she was in a fight, but she didn't name Willie as the one who had beat her.
Q And did Lindsey Price state that at the time she

was intimidated and that's why she didn't say that this defendant had beat her?
A     Yes.
Q     Based on your training and experience and what you know of this case, if this defendant was let out, do you think that there is a possibility that Lindsey Price could be further intimidated by this defendant or somebody in his family?
A     Yes.
Q     Now, I started the question about warrants or the threat of arrest warrants by Sheriff Joe Russell has been used to protect this defendant or further the benefits of this defendant.  Are you aware of any warrants that were threatened of a person by the name of Sarah Bamburg?
A     Yes, I am.
Q     And that's B-A-M-B-E-R-G; is that correct?
A     I believe it is B-A-M-B-U-R-G.
Q     Okay, thank you.  Tell the Court about how arrest warrants were threatened against Ms. Bamburg.
A     There was a time when the individual, Sarah Bamburg, had warrants for her arrest and she didn't have anywhere to stay, so Willie Russell offered to let her stay at his house, which is also Sheriff Joe Russell's house.
Q     Okay.  Go ahead.
A     Ms. Bamburg was very hesitant to go stay at the

sheriff's house with active warrants. Willie assured her that it's the safest place you can be, don't worry about it. As long as you are with me, you are not going to be arrested.

Q And did Sarah Bamburg then say that in order to stay there and not be arrested on those warrants there were certain favors or things she had to go along with for this defendant?

A Yes, she indicated that she was having sex with Willie Russell.

Q Did she feel like she was compelled to have sex?

A Yes. There were -- anytime she said that she would try to stop his advances or not want to have sex with her, he would remind her that...you've got warrants and as long as you are here dating me, you are not going to get arrested.

Q Now, during the time that Sarah Bamburg was staying at Willie Russell's house, which happens to be Sheriff Joe Russell's house, was she using methamphetamine?

A Yes.

Q Where did she get the methamphetamine?

A From Willie.

Q This defendant here?

A Yes.

Q And did Sarah Bamburg explain a particular method

that this defendant would use to provide methamphetamine to Sarah Bamburg?
A     Yes.  She referred to it as booty bumping.
Q     And would you describe for the Court what Sarah Bamburg then described to you as to how methamphetamine was administered to her in this term called booty bumping?
A     It would be placed in a syringe.  I believe it would be watered down first.  It would be mixed up, placed in a syringe, and then shot into her rectum.
Q     By this defendant?
A     Yes.
Q     And that was the term they called booty bump?
A     Booty bumping.  She said that happened approximately three or four times while she was there at Willie Russell's house.
Q     Did that give her some kind of higher rush of methamphetamine or ingested in a quick way?
A     That's my understanding, that it just hits your system a little quicker.
Q     Now, at some point in time did Sarah Bamburg have enough of these advances and this conduct and try to leave Willie Russell?
A     She did.
Q     Tell us about that.
A     She initially left, went to an individual's house

that she -- she describes it as somebody that she didn't think Willie would mess with.  At some point she contacted him and said you need to bring my stuff to me from your house.  She didn't feel comfortable going and getting her things.  So she wanted him to bring her things to that location.
Q     And again, for the record, you are saying "him". She contacted Willie Russell to get her things?
A     Willie Russell, yes.
Q     And then what happened.
A     Willie, Willie Russell showed up driving the sheriff's truck again and got on the P.A. system as soon as he pulled up at the house and said something to the effect of come get your shit over the P.A. system in the truck.
Q     All right.  Now, did somebody ever come to that house or come to try to execute these arrest warrants on Sarah Bamburg?
A     No, not at that house.  Sarah Bamburg stayed there approximately one night and then she went to another individual's house and stayed there.
Q     Whose house was that?
A     Corey Carlisle.
Q     And did law enforcement come to Cody -- Corey -- was it Cody?
A     Corey Carlisle.

Q Corey Carlisle. -- to Corey Carlisle's house in order to execute those arrest warrants?
A Yes. That next day a Love County sheriff's office deputy showed up and said, "Joe," meaning Joe Russell, "sent me to arrest Sarah." Corey Carlisle told the deputy that she is not here and the deputy left.
Q And that deputy worked for Sheriff Joe Russell; is that correct?
A That's correct.
Q And do they work at the pleasure of Joe Russell?
A Yes.
Q There is no civil service protection or anything? They could be fired like that?
A Yes, they can be fired at the whim of Joe Russell, correct.
Q Okay. The next day did somebody else come back to see if Sarah Bamburg was there to execute the warrants?
A Yes. At that point the undersheriff, Harvey Stewart, and another deputy showed up at Corey Carlisle's house or apartment.
Q And did they search the house for Sarah Bamburg?
A They did. I believe Harvey Stewart asked Corey if he minded if they looked around and Corey said okay and they went in and searched.
Q And was Sarah Bamburg there?

A Yes.
Q And were the arrest warrants executed?
A No.
Q Why not?
A I don't know. Supposedly the deputy saw Sarah Bamburg hiding in the shower. It was a clear shower curtain. He called Harvey Stewart in. Harvey Stewart looked, saw her in there, closed the shower curtain, stepped back out and spoke with Corey Carlisle.
Q And what did the undersheriff tell Mr. Carlisle --
A At that point he told Corey Carlisle that I think it would be a good time for the two of you to go visit your grandparents or visit their ranch or help out on their ranch or something like that.
Q Somebody in law enforcement actually doing the right thing?
A That's correct.
Q So the next day did they, in fact, take Mr. -- take Undersheriff Harvey Stewart's advice?
A They did not. They stayed at the apartment.
Q And who came the next day?
A The next day or the next morning early Joe Russell showed up banging on Corey Carlisle's door.
Q The sheriff himself?
A Yes.

Q And did he arrest Sarah Bamburg?
A He did.
Q And as a part of your investigation were you able to show that then Sheriff Joe Russell called his son, the defendant, and reported what had happened?
A Yes. He then placed a call to Willie Russell and said I got her or something to that effect.
Q Now, Mr. Carlisle was there and he voiced some displeasure to the sheriff about how Ms. Bamburg was being treated; is that correct?
A That's correct.
Q What happened?
A Corey Carlisle basically had some words with the sheriff to the effect of why is it okay for her to live at your house with Willie and get high and have warrants and not be arrested, but then when she comes here everybody is after her and she gets arrested.
Q And what happened to Mr. Carlisle for even saying that to the sheriff?
A He was arrested for harboring a fugitive.
Q Based on your investigation is that the time of intimidation that is going on in Love County?
A Yes.
Q Are you familiar with a person by the name of Zoey Wolfe?

A Yes.
Q And are you familiar with a point in time when Zoey Wolfe was 17 and she called the police and said that she was being kidnapped by this defendant and being held against her will at the defendant's house?
A Yes. And she has been described to be as 17, so I am assuming that is correct.
Q And being kidnapped and held at the defendant's house was actually Sheriff Joe Russell's house; is that correct?
A That's correct.
Q Would the sheriff's department come out and handle that call?
A Yes. As a result of her telephoning the sheriff's department, a deputy arrived and -- and I believe at that time Ms. Wolfe told the deputy that -- something to the effect of I really haven't been kidnapped or she tried to let them know that she hadn't been straight up kidnapped by Willie. I believe the situation probably was that she and Willie had been drinking at Willie's house and Willie was too drunk to drive her anywhere. So as a result, she called somebody at the sheriff's department to come get her.
Q Do you know the defendant's approximate age?
A I believe he is around 40.

Q And Ms. Zoey Wolfe at the time was approximately 17 based on your knowledge here today?
A That's correct.
Q All right. But did the sheriff's deputies come out as a part of this call?
A They did. One of them spoke with Ms. Wolfe and then another one showed up and the original deputy then went to Joe Russell's house in an effort to speak with Willie Russell.
Q And were they allowed to do a full investigation?
A I believe the deputy knocked on the door and Joe Russell came to the door. The deputy asked to speak with Willie and Joe indicated something to the effect of he is passed out in the back room. The deputy told Joe Russell that...well, I need to speak with him. Willie came out. He asked if he was going to be arrested. I believe the deputy said no, we are just trying to figure out what happened. I believe at that time Joe Russell said something to the effect of yeah, she has been here all -- you know, for several hours hanging out with Willie. At that point I believe the deputy then went back to speak with Ms. Wolfe again.
Q As a part of this investigation are you also aware of any women that may have been taken into custody while partying at the Red River area?

A     Yes.  It has been reported to us that at least on one occasion, possibly two, Sheriff Joe Russell has arrested females that were either high or drunk that were partying on the Red River in bikinis and then would take them to his house.
Q     Now, where is Sheriff Joe Russell's house?
A     It is in the town of Leon.
Q     How close is Leon, Oklahoma to the Red River?
A     I am going to say approximately four or five miles as a crow flies.
Q     So the reports that you've gotten as a part of your investigation is that there would be women in bikinis that would be down at the river; is that correct?
A     That's correct.
Q     And the sheriff would go down there and do what with these ladies?
A     Basically arrest them for public intoxication and then at that point instead of taking them to jail, he would take them to his house where Willie was and either have -- it has been reported to have them dance, strip.  Either Willie would strip them, sometimes Joe would.  And these were apparently the kind of girls that once they realized that they weren't going to go to jail, that they were just at another party, they would then go ahead and partake of the meth that Willie would offer them and stay and party.

Q Okay. So the sheriff went in his sheriff's department vehicle?
A I am not sure about that. I am not sure what vehicle he was in.
Q Did the sheriff use handcuffs?
A Yes.
Q So he handcuffed these ladies and brought them back to his house?
A Yes.
Q For this defendant to party with them?
A Correct.
Q Now, one of the witnesses that you've interviewed as a part of this investigation and also appeared before the grand jury is Ms. Hodges; is that correct?
A That's correct.
Q And she has provided evidence and testimony of the acts of violence that you've testified about here to this court?
A Correct.
Q And also the ongoing drug dealing activities of Willie Russell; is that correct?
A That's correct.
Q And Ms. Hodges stated that she -- first of all, was she involved in the drug buy associated with this particular charge that the defendant is here for?

A She was, the May 29th charge, correct.
Q She was the U.C.?
A Yes.
Q Undercover?
A Yes.
Q Or not undercover, but the confidential informant.
A Correct.
Q But she has also been in a pattern of drug dealing with this defendant; is that correct?
A That's correct.
Q On numerous occasions while this defendant delivered drugs?
A Yes.
Q Now, as a part of her cooperation in this case, has Ms. Hodges received any threats or enticements from people in order to maybe get Mr. Russell out of this case?
A Yes, she has been worried.
Q Okay. Tell us about that. What worries and what type of contact has she had that makes her worry?
A Well, she has had contacts with known associates of Willie and Joe Russell, methamphetamine users that have attempted to lure her into Love County away from Carter County and into Love County. It has worried her.
Q How have people tried to lure her into Love County?
A Basically trying to get her to come down there to

purchase methamphetamine.
Q     Now, as a part of the intimidation of witnesses that we've talked about, has there been a series of missing people over the last several years which has caused people to have a concern over cooperating with law enforcement?
A     Yes.
Q     Tell the Court about that.
A     There are three individuals that come to mind immediately.  The first one was an individual named Jordan Buckaloo.  He disappeared and then was later -- he was rumored to have been murdered and then later his remains were found in the area approximately a year later.
Q     Okay.  And are any other people missing that have created this concern on anybody cooperating with law enforcement and going against Sheriff Joe Russell?
A     Yes.  There are two individuals that have disappeared form that area, Colt Haynes and a female named Mollie Miller.  They disappeared around 2013 and have not been seen since.
Q     Were they involved in drugs when they disappeared?
A     Yes.
Q     Were they involved with people associated with Joe Russell when they disappeared?
A     Yes.
Q     And as you and other agents with the FBI have gone

through interviews, has that made it even more difficult as a part of this investigation because of the real fear of these people disappearing?
A     Yes, that has been an overlying theme of all of the interviews we have done.  Everybody is very hesitant to talk.  They don't want Joe Russell knowing that they are talking.  So, yes, I would say they are all scared.
Q     Again, this investigation is ongoing?
A     It is.
Q     In your opinion do you believe if this defendant was realized it would potentially hamper your ongoing investigation?
A     Yes.
MR. HORN:  No further questions, Your Honor.
THE COURT:  Mr. Hopkins.

CROSS EXAMINATION

BY MR. HOPKINS:
Q     Agent, could I get your name again for the record?
A     Steve West.
Q     Agent West, my client, Willie Russell, is not the sheriff of Love County, is he?  He is not the sheriff of Love County; right?
A     No, he is not.
Q     And he is not a law enforcement officer; correct?
A     That's correct.

Q And he does not have the legal authority to place handcuffs on anybody or arrest anybody; correct?
A Correct.
Q In fact, during your investigation you found no evidence that my client, Willie Russell, has arrested anyone or placed handcuffs on anyone; correct?
A Correct.
Q Now, as far as your investigation, are you familiar with my clients prior record, legal record, criminal record?
A Am I familiar with it?
Q Right.
A Yes.
Q And he has no prior drug convictions; correct?
A That's correct.
Q In fact, the only time he has ever been arrested for drugs is the conduct which is the subject of this Indictment; correct?
A I believe that's correct.
Q So he is indicted for this controlled drug buy that happened in Carter County in May of this year and he has not been arrested for anything prior to that; correct?
A I believe that's correct.
Q Now, shortly after he was arrested in Carter County he bonded out in Carter County; correct?

A Yes.
Q And he was out on bond on that case up until the time he was arrested in this case on the complaint that was filed in October, around October 20th; correct?
A And during that time he was -- that would be about -- between four and five months, a little over four and a half months, correct, from May -- from around June 1st until say late October?
A Yes, that's correct.
Q And he was not arrested or charged with anything during that period that he was out; correct?
A That's correct.
Q And you've found no evidence that he was involved in anything illegal in that time period that he was out on release in the state case; correct?
A That's correct.
Q And you found -- you have not found any evidence that he did anything at all to violate the conditions of his release in Carter County; correct?
A That's correct.
Q He made his court appearances?
A As far as I know he did, yes.
Q And he committed no -- there have been no allegations or evidence of new crimes; correct?
A That's correct.

Q Now, this was -- the charges in Carter County involve the exact same criminal conduct which is the subject of the Indictment in this case; correct?
A That's correct.
Q The exact same transaction?
A Yes.
Q And that's one single controlled drug sale of 2.8 grams of methamphetamine in exchange for $200.00; correct?
A Yes.
Q Now, my client has never been arrested for any crime involving violence; correct?
A That's correct.
Q So the -- when you look at -- considering the conduct in this case, what he was arrested for in May, my client has no prior drug arrests; correct?
A Correct.
Q And he has no prior arrests for violent crimes; correct?
A No prior arrests, that's -- well, you know, I am not sure if the time that he assaulted Lindsey Price -- I know deputies arrived at the scene and I know Mr. Russell was saying that he would never do a day in jail and -- and at that point whether he was actually arrested or not, I am a little unclear on.
Q But you would agree with me that there is no record

of him being arrested for --
A That's correct. You asked whether he had been arrested and I wasn't sure if on that occasion technically he was arrested or not.
Q When you review his criminal record, it shows no prior arrests for violent crimes. You would agree with that; correct?
A That's correct.
Q And certainly no convictions; correct?
A Correct.
Q And certainly no convictions; correct?
A Correct.
Q Now, after you arrested my client -- were you involved in that arrest?
A Yes.
Q Okay. In May of this year; correct?
A No, not the arrest in May, the arrest in October.
Q Okay. Are you familiar with the arrest that was made in May?
A Yes.
Q You testified about -- that you interviewed my client and he made a statement. Was that after the October arrest or after the --
A It was after the October arrest.
Q Okay. Now, he was arrested in October.

A Now, just to clarify. I believe what I was asked was whether or not he -- after he was arrested in May, whether he was read his rights, whether he created a statement, and I answered yes to those. Those are documents that I've reviewed from the May arrest.
Q So was he interviewed twice, once in May after that arrest by state officials, I presume?
A Yes.
Q And then he was arrested -- and then when he was arrested in federal court, he was interviewed by federal officials?
A That's correct, when we arrested him in October, yes.
Q Now, he was polite and cooperative during those interviews; correct?
A Correct.
Q Both times, both by the state and the federal...
A As far as when we arrested him, yes. I can't speak to the state arrest.
Q When you interviewed my client, he was polite; correct?
A Correct.
Q He was cooperative; correct?
A Correct.
Q He made no hostile or threatening statements towards you; correct?

A Correct.

Q And he wrote a statement basically admitting his conduct as to what he had been arrested for?

A He did not write a statement when we interviewed him.

Q Was that back in May when he wrote the statement?

A That's correct.

Q When you arrested him, were you already familiar with that statement?

A Yes.

Q Had you reviewed the records of that arrest in May when you arrested him in October?

A Yes.

Q So the two times that he has been interviewed by law enforcement, he was cooperative on both occasions?

A When we arrested him he was cooperative, yes.

Q Now, there has been -- you testified a lot about my client's father and other things allegedly happening in Love County. Now, isn't it true that my client has not been charged or indicted for any conspiratorial drug activity involving his father; correct?

A That's correct.

Q So as we stand here today, he is only charged with one thing and that's this delivery of 2.8 grams of methamphetamine in Carter County; correct?

A That's correct.

Q He has not been charged with anything else?
A No.
Q Now, Lindsey Price, my client was never charged or arrested for domestic assault involving Lindsey Price; correct?
A Well, that's where I am a little unsure on the arrest. At the time I know Sheriff Russell made a call to someone and was heard to say just go sign some papers, you are going to be released O.R. So whether he actually went in and we consider that an arrest or not, I am not sure.
Q Have you seen any records of an arrest outside of what somebody told you? I mean, any reports, police reports of an arrest.
A No.
Q So the only evidence you have of an arrest is what someone said. You have not seen any police reports or -- you know, law enforcement documents are normally generated when someone is arrested; correct?
A I am trying to remember if I have actually reviewed police reports from that incident. I may have seen some -- at least a report of that incident, but as far as I know, he wasn't actually arrested, put in cuffs that I know of. It may have happened, but...
Q You would agree that when an FBI criminal background

check is conducted on Willie Russell that there is nothing involving such an arrest showing up in the background check; correct?
A Correct.
Q Now, have you ever been provided any medical records for these injuries purportedly suffered by Lindsey Price?
A Yes.
Q Have you reviewed medical records?
A Yes.
Q And what do those medical records state as to injuries?
A Injuries consistent with what was described to us.
Q And what was that?
A One of them was a cut over an eye, I believe she had stiches. There are a couple of different times that she sought medical care, so...I mean, we can go through each one, but on each occasion there was medical care provided.
Q So at the time that those medical -- at the time that she sought that medical treatment, she didn't make any allegations regarding Mr. Russell then, did she?
A No, she did not.
Q So when you review those medical records, there are no complaints by Ms. Price that she was assaulted in any way based on a review of the medical records; correct?
A Correct.

Q So she never made any allegations to the medical treatment providers that she was assaulted by my client; correct?
A That's correct.
Q Sir, what have you done, if anything, to corroborate the statements made by Lindsey Price?
A We talked to another individual that was called to Lindsey Price's residence when she had been beaten severely. He came over there to her aid or to try to assist her. He saw how badly she had been beaten and was threatened with arrest by Joe Russell. So that's one person we have spoken to. I talked to numerous people throughout the course of the investigation that have said you need to go talk to Lindsey Price. Willie used to beat the hell out of her continually and nothing would happen because the sheriff would not let anything happen. So as far as corroborating Lindsey Price, it is really just statements by numerous people that have been a witness to the abuse and the alleged cover-up.
Q These individuals that have said that my client beat up Lindsey Price, is that based on what Lindsey Price told them or based on -- or were they actually there to observe the abuse?
A In some instances it is things that they heard and then in some instances it is things that they actually

witnessed or possibly that Lindsey Price told them that, yeah, this -- if she was beat up, that she would tell them that it was from Willie.

Q A lot of -- suffice it to say, a lot of these people that you talked to in an attempt to corroborate Lindsey Price were basically just telling you things that Lindsey Price told them; right?

A On occasion, yes.

Q Are you aware that my client has not been in contact with Lindsey Price in over a year?

A I am not sure how long it has been since he has talked to her.

Q But you don't have any evidence that he has been in contact with her over the last year, do you?

A No.

Q So you don't have any evidence that he is in contact with her at all presently; correct?

A Correct.

Q Sarah Bamburg, she never filed any complaints with law enforcement; correct?

A No.

Q She never filed any complaints with law enforcement alleging that she has been raped; correct?

A No, other than the -- what she related to us, the FBI.

Q All right. What have you done, if anything, to

corroborate those statements by Sarah Bamburg?
A     Well, once again, we have talked to Corey Carlisle, who -- I mean, I can go through different interviews, but Corey Carlisle backed up every bit of what she said. Their statements were almost -- I mean, the followed very closely.  So everything that Sarah Bamburg told us, Corey Carlisle at a different time pretty much told us the same thing.  Once again, other people would mention -- if we were talking to them about something else, they would mention Sarah Bamburg lived there, she had warrants and she was arrested until she left Willie.  So it has been mentioned several times before and after we spoke with Ms. Bamburg.
Q     And, sir, if you don't mind, who is Corey Carlisle?
A     Corey Carlisle is the individual that Sarah Bamburg went to stay with after she left Willie.  She is the individual -- she was staying in his apartment when Joe Russell sent the first deputy, then when he sent Harvey Stewart to arrest her, and then when he came himself and arrested her.  Corey Carlisle is the individual who was eventually arrested right after Sarah Bamburg was arrested for harboring a fugitive.
Q     Now, Corey Carlisle wasn't present when Ms. Bamburg allegedly said that my client forced her to have sex; correct?

A No, he was not. He was not one of the ones present in the house, no.

Q So he really couldn't corroborate that because all he knows is what she told him; right?

A That's correct, he did not see them having sex.

Q So the only -- there is -- you really don't have any evidence to corroborate those allegations by Sarah Bamburg, just the word of Sarah Bamburg; correct?

A There is another individual that witnessed Sarah Bamburg being booty bumped, yes.

Q Is there any allegations that she was acting involuntarily, that she was being forced to do anything?

A No.

Q So if Sarah -- the evidence you have as to Sarah Bamburg being booty bumped, Sarah Bamburg did so voluntarily; correct?

A Yeah, the -- I haven't talked to anybody that said that she was being held down or forced. So any coercion would have been not physical.

Q So no physical coercion as to Sarah Bamburg?

A As far as I know, correct.

Q Now, the sheriff of Love County is not the only law enforcement agency with jurisdiction over crimes happening in Love County; correct?

A They are the only ones with jurisdiction outside of

the town of Marietta.
Q But there are other investigative law enforcement agencies that would have jurisdiction to investigate alleged crimes in that area?
A Yes.
Q That would include your office, the FBI office, there in Ardmore?
A Correct.
Q And methamphetamine is a federal substance, federal controlled substance, so your agency has jurisdiction to investigate drug related crimes in Love County; correct?
A Correct.
Q There is also the Oklahoma State Bureau of Investigation which has jurisdiction to investigate crimes throughout the state of Oklahoma; correct?
A Correct.
Q And the Oklahoma Bureau of Narcotics, OBN, would also have jurisdiction to investigate crimes?
A Correct.
Q But there is no indication that Sarah Bamburg or Lindsey Price or anyone else went to any of these other law enforcement agencies that have jurisdiction over Love County to make any complaints; correct?
A That's correct. As far as I know, they did not.
Q But they could have, that option was available to

them; correct?
A I would say possibly, yes.
Q And, again, while my client's father was the sheriff of Love County, there is no evidence that he had any close relatives working at OBN, the FBI, or OSBI; correct?
A Correct.
Q Okay. Let's go to the part about -- you testified that people have told you that Joe Russell, my client's father, went down to the river and arrested women or handcuffed women. You don't have any evidence that my client, Willie Russell, went down to the river and handcuffed or arrested anybody; correct?
A Correct.
Q Now, you have got this evidence that there were -- people have said that women or girls in bikinis down by the river were handcuffed. Have you interviewed any of these women or girls that were supposedly handcuffed?
A No.
Q So we don't have any -- none of these women or girls that were supposedly handcuffed have made any complaints; right?
A Correct.
Q Have you identified any of them?
A No.
Q Have you been provided any names of any?

A No.

Q Is it the -- is Teremy (sic) Hodges the only person that you talked to that testified that this happened or stated that this happened?

A The only eyewitness to it, correct.

Q So, really, the only evidence that you have that this stuff about handcuffing girls on the river and taking them to the house is based solely on the word of Teremy Hodges?

A That's correct.

Q And Teremy Hodges does have a criminal record; correct?

A Yes.

Q Now, finally, there has been testimony today about two missing individuals from the Love and Carter County area.

A Yes.

Q Who are those people?

A Colt Haynes and Molly Miller.

Q Do you have any evidence at all that my client, Willie Russell, ever came into contact with those people or knew them?

A No.

Q Do you have any evidence that my client would have a motive to hurt them?

A No.

Q You don't have any evidence that he is connected to their disappearance at all, do you?

A No.

Q You don't have any more evidence on him than you would me or anybody else in this courtroom; correct?

A No.

Q Correct that you don't have evidence or you just -- or no that you don't have evidence?

A Maybe you want to repeat the question.

Q Do you have any more evidence that my client was involved in their disappearance as you would me or anybody else in this courtroom?

A No.

MR. HOPKINS: Pass the witness.

THE COURT: Mr. Horn?

MR. HORN: No further questions, Your Honor.

THE COURT: You may step down. Thank you. Any additional witnesses?

MR. HORN: Not from the government, Your Honor.

THE COURT: Mr. Hopkins?

MR. HOPKINS: Yes, I would like to call my client's mother, Cheryl Mahorney.

CHERYL ANN MAHORNEY, DEFENDANT'S WITNESS, SWORN

DIRECT EXAMINATION

THE COURT: Go ahead, Mr. Hopkins.

MR. HOPKINS: Yes, ma'am.

BY MR. HOPKINS:

Q Please state your full name for the record.

A My name is Cheryl Ann Mahorney.

Q And, ma'am, where do you reside?

A Ringling, Oklahoma.

Q And are you the mother --

THE COURT: Just a moment, Mr. Hopkins. How do you spell your last name, ma'am?

THE WITNESS: M-A-H-O-R-N-E-Y.

THE COURT: Go ahead.

BY MR. HOPKINS:

Q And, ma'am, are you the mother of my client, Willie Russell?

A Yes, sir, I am.

Q And are you divorced from his father?

A Yes, sir, I have been divorced from his father for 40 years.

Q How old was Willie when you and his father divorced?

A Willie was just a -- probably 3 or 4 years old.

Q Growing up, who did he primarily live with?

A He lived with me.

Q Now, where did you live when Willie Russell was growing up?

A I lived in Ringling, Oklahoma.

Q And where did his father live?
A His father lived in Leon.
Q And how far are those two towns apart?
A Oh, 30 miles, I guess.
Q So they are two separate communities?
A Yes, sir.
Q Growing up through -- did Willie go to high school in Ringling?
A Yes, sir, except for one year.
Q Did he go to Ringling public schools his entire -- all of the way from kindergarten through high school, except for one year?
A Yes, sir, he did.
Q And where did he go that one year?
A He attended Turner High School for one year. At that time he had moved to -- I don't know if Joe was living in Leon or close to Marietta, but Willie was living with him and he attended Turner High for maybe a year, if that much.
Q So growing up did Willie live with his father one year and with you the 17 other years?
A Yes.
Q Ma'am, what do you do for a living?
A I am a CNA.
Q Is that a Certified Nurse's Aide?

A Certified Nurse Aid.
Q And can you kind of describe for the court what you do?
A I work in -- for a company called Cowboys. They are out of Stigler, Oklahoma. They have homes in Ardmore, Pauls Valley, all around the southern communities. We take care of mentally and physically challenged people.
Q Is that what you do in your job, is you --
A Yes, sir.
Q You provide care for adults that are developmentally or mentally disabled?
A Yes, sir.
Q Physically disabled?
A Yes, sir.
Q Okay. Now, being a Certified Nurse's Assistant, did you have to go through some training?
A Yes, sir, I did.
Q Can you for the court describe what training you went through?
A I went to Vo-Tech for classes, but the company I work for, we have to take individual classes through them. We have to be medication certified so that we can give meds to our clients. We have to be first aid, CPR, we have to -- just like a regular nurse. We have to have all of the training. We just don't do what the nurse's do. We just

go in the home and teach these people how to -- try to teach them how to live an independent life as well as they can with their disability. I lot of them are in wheelchairs. A lot of them are bedfast. Some of them have the mentality of maybe a 10 year old, but they are in an adult world and we have to try and help them to learn to adjust to that adult world.

Q     Now, ma'am, how long has your son lived with his father?

A     Well, let's see. Willie was living in Wynnewood when I lived in Wynnewood. So he was up there in -- well, I am trying to remember. 2009, I believe, 2010, Willie was living in Wynnewood about three miles from me. And then when I got my divorce and I moved back to Ringling, at that time Willie was moving back to Leon to be close to his dad.

Q     So would it be accurate to say he has probably lived with his dad the last two or three years or something like that?

A     Yes, sir.

Q     But before that, did he live apart from his dad?

A     Yes, sir.

Q     Has he lived apart from his dad the majority of his adult life?

A     Yes, sir.

Q Outside of this last two or three years that he has been with his dad, do you recall him ever living with his dad?
A Just when he was 13 he lived with his dad for maybe a year and then he moved back home with me.
Q So as an adult, prior to this last two or three years, you don't ever recall him living with his dad?
A No.
Q Ma'am, are you close to your son?
A Yes, sir, I am.
Q Do you believe your son has a drug problem?
A Yes, sir, I do.
Q Are you desirous of your son getting some help?
A Yes, sir, I am.
Q Getting some treatment?
A Yes, sir.
Q And based on your conversations with Willie, is Willie desirous of getting help, treatment?
A Yes, sir, we have discussed it many a times.
MR. HOPKINS: Your Honor, I pass the witness.
THE COURT: Mr. Horn.
MR. HOPKINS: Wait, I've got one more question, if I could.
THE COURT: Sure.
BY MR. HOPKINS:

Q Ma'am, if Willie was released under the condition that he go to an inpatient drug rehabilitation facility pending the resolution of this case, as a mother would you do all that you could in your power to help him get through that treatment?
A Yes, sir, I would.
Q Would you do everything in your power to make sure that he stayed in the program and did what was required of him in the program?
A Yes, sir.
Q Would you do everything in your power to help him comply with the rules and conditions that the Probation office would have for him?
A Yes, sir.
Q And that the Court would have for him?
A Yes, sir.
Q And would you do everything in your power to make sure that he made his court appearances and was available to meet with his attorney and meet with the Probation Office and other court designated personnel?
A Yes, sir, I would.
Q All right. Thank you.
MR. HOPKINS: Pass the witness.
THE COURT: Mr. Horn.

## CROSS EXAMINATION

BY MR. HORN:

Q You would advise your son to follow those rules because you believe in the rules; is that right?

A Yes, sir, I do.

Q And if he strayed you would give him the advice to continue to follow those rules?

A Yes, sir, I would.

Q Because rules are important?

A Yes, sir, that's why we have them.

Q And that would be cooperating with whatever Probation says needs to be done?

A Yes, sir.

Q Cooperating with this Court with every rule or requirement that this Court puts on him?

A I request that my son tell the truth and nothing but the truth and that's all I can do. That's all we can do as a parent.

Q And you would give him that and you have given him that advice all of your life being a mother to this son?

A Yes, sir.

Q To cooperate?

A Yes, sir.

Q And have you given him that advice in the last couple of weeks since he has been in jail?

A I've told Willie that from the time he was big

enough to understand.
Q Ma'am, that was a yes or no question.
A Yes, I have told --
Q And you realize your jail phone calls are being recorded --
A Yes, sir, I know.
Q And you realize that these FBI agents have listened to your calls?
A Yes, sir.
Q And you realize you are under oath?
A Yes, sir.
Q And in jail -- and while your son has been in jail, have you advised him don't say nothing, don't cooperate because you don't know nothing?
A I told him you can't tell something that you don't know.
Q And then, ma'am, did you also say in that same phone call -- excuse the language to the Court -- fuck the feds?
A No, I didn't say fuck the feds.
Q That's not you?
A No. I don't say that about people.
Q So in those conversations if these agents have a phone call about that, that's not you?
A No.
MR. HORN: No further questions, Your Honor.

THE COURT: Mr. Hopkins?
MR. HOPKINS: No further questions.
THE COURT: You may step down, ma'am. Thank you. Call your next witness.
MR. HOPKINS: Your Honor, I have no further witnesses. I just have a proffer I would like to make.
THE COURT: You may make the proffer.
MR. HOPKINS: That if my client was called to the stand that my client would readily admit that he has a drug problem and that he is in need of treatment, that he is seeking treatment.
THE COURT: Any objections to that proffer, Mr. Horn?
MR. HORN: No, Your Honor.
THE COURT: The proffer is accepted.
MR. HOPKINS: And that he is desirous of treatment.
THE COURT: Anything further?
MR. HOPKINS: Nothing further.
THE COURT: Mr. Horn?
MR. HORN: No further evidence, Your Honor. Just as argument, Your Honor, this is a presumption crime. We would argue that the defendant has not rebutted the presumption that not only is associated with the crime, but also the evidence that this defendant would be a threat

to the community and certainly a threat to any witnesses should he be released. Thank you.

THE COURT: Thank you.

MR. HOPKINS: Your Honor, you know, when you look at the criminal record or the lack of a criminal record, it just doesn't match up with the government's allegations against my client. He has no prior arrests for any -- he has never been arrested or charged with any violent crime. He has no prior controlled substance arrests.

We have had a lot of hearsay statements today that people have said. A lot of these things, Your Honor, are simply uncorroborated. At the end of the day when we wade through all of this stuff, what we have got here is a one count Indictment alleging a 2.8 gram sale of methamphetamine. That's all he has been charged with.

As to these statements involving his father, he has not been -- he has not been charged with any conspiracy involving his father.

Your Honor, as to the government's concerns about Love County, we are not asking for the Court to release Willie unconditionally or to release him as you normally would someone on pretrial release. What we are asking the Court to consider is releasing Mr. Russell to an inpatient drug treatment facility pending resolution of this case. There are 26 counties in this judicial district and there

are a lot of places that he can go that are a long way from Love County. So any concerns about what happens or what happened in Love County, we propose it will be alleviated by just simply finding a facility that is a long distance away from Love County. Any of the facilities here in this area, Your Honor, would be a long distance away from Love County.

Also, we would like to -- what he is charged with, the offense conduct, he was arrested for that in Carter County five months ago, five or six months ago. He was -- he made bond and he was out from around the first of June up through October 20th, almost five months. During that time, and the agent testified to this -- during that time there has been no evidence of him committing any new crimes, there is no evidence that he failed to go to court as required or failed to meet conditions of his bond or his release in Carter County. So he bonded out once and he didn't go anywhere and he committed no new crimes and the record reflects in the report, as my client conveyed to the Probation Office, that he was in the process of seeking admittance into a drug treatment program in Carter County at the time he was arrested.

You know, given the lack of any prior criminal record here, given the relatively small amount of drugs involved in this case -- you know, we are not dealing with a 10 to

life statutory minimum sentence here. We are dealing with a zero to 20. It is a low amount. He has no criminal history. There is no evidence of him being a flight risk. I think that we have rebutted the presumption. I believe that the government's concerns can be alleviated by finding a facility for Mr. Russell that is a fair distance away from Love County.

THE COURT: Thank you. Once again, the Court notes that this is a rebuttable presumption for detention and the Court finds that the defendant has failed to rebut that presumption as he poses a history of flight risk and a danger to the community and should be detained.

Anything further?

MR. HORN: Nothing from the government, Your Honor.

MR. HOPKINS: No, Your Honor.

THE COURT: Thank you. You all are excused.

(END OF PROCEEDINGS)

"I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter."

s/Karla S. McWhorter

KARLA S. McWHORTER

February 12, 2016

DATE